**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

WILLIE MACON,

Plaintiff,

vs. CASE NO.:

CULVER FRANCHISING SYSTEM, LLC
Foreign Limited Liability Company
d/b/a CULVER'S

INJUNCTIVE RELIEF SOUGHT

Defendant(s).

# COMPLAINT

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues CULVER FRANCHISING SYSTEM, LLC, Foreign Limited Liability Company, d/b/a CULVER'S ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant to Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set forth in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.culvers.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2. MACON files this lawsuit because Defendant's policies exclude him, and millions of other potential consumers, from fully and equally enjoying Defendant's products and services.

3. Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, Orlando Division, pursuant to 28 U.S.C. § 1391(b) and Internal Operating Procedures for the United States District Court of the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Orange County, Florida.

6. Defendant attempts to and indeed does, participate in Orange County's economic life by offering and providing products and services over the internet to Orange County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant's restaurant system includes a franchised Culver's restaurant with a physical address of 4591 Power Center Ln, Orlando, FL 32839 (hereinafter the "Orlando Location"), which is located in Orange County, Florida. Defendant licenses the Culver's name, marks, and menu to the Orlando Location, and through Defendant's Website, controls the menu, ordering, and location information that customers use to transact with the Orlando Location.

8. MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9. MACON is a natural person over the age of 18 and is blind.

10. MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11. MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12. MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using

> the visual internet, a seeing user learns that a link may be ‘clicked,’ which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be ‘clicked on,’ the software reads the link to the user, and after reading the text of the link says the word ‘clickable.’...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. MACON’s blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15. Defendant is a Foreign Limited Liability Company organized under the laws of Wisconsin, with a principal place of business at 1240 Water Street, Prairie de Sac, Wisconsin, 53578. Defendant is the franchisor of the Culver’s restaurant system which includes the franchised restaurant located at 4591 Power Center Ln, Orlando, FL 32839 (hereinafter the “Orlando Location”).

16. Defendant franchises and controls the Culver's restaurant system, which offers food and beverage products to the public, including burgers, chicken, seafood, sandwiches, salads, frozen custard, and beverages, at Culver's restaurant locations, including the Orlando Location, and through Defendant's Website. Defendant's Website allows customers to access menu offerings, locate Culver's restaurants, including the Orlando Location, select and customize menu items, place online orders for pickup, purchase gift cards and enroll in Defendant's rewards program.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance. Upon information and belief, Defendant, and not the individual franchisee, controls the design, content and functionality of Defendant's Website, including the menu, item customization, and ordering tools through which customers place orders for pickup at the Orlando Location, and Defendant therefore controls the access barriers alleged herein.

18. The Orlando Location is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). The Orlando Location is also referenced as a "place of public accommodation."

19. Defendant's Culver's restaurant system operates from multiple physical locations, including the Orlando Location, and Defendant maintains Defendant's Website as a digital extension of those physical establishments. Defendant uses the same Website in connection with every Culver's restaurant location, including the Orlando Location. Defendant's Website is owned, controlled, and operated by Defendant in direct connection with the Culver's restaurant system and is accessible to consumers nationwide. Through Defendant's Website, consumers can review menu offerings, locate and select Culver's restaurants, including the Orlando Location, customize menu items, place orders for pickup, purchase gift cards, and enroll in Defendant's rewards program. Because Defendant's Website serves as a gateway through which consumers access and transact with Culver's brick-and-mortar restaurants, including the Orlando Location, a sufficient nexus exists between Defendant's Website and the Orlando Location as a place of public accommodation.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of the Orlando Location that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same

full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and the Orlando Location. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21. MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, the Orlando Location.

22. During MACON's Website Visits, MACON attempted to use Defendant's Website to review Defendant's menu, select and customize food items, and place an order for pickup from the Orlando Locatioin, the same transactions available to non-disabled customers. Inaccessible quantity and sauce-selection controls and a keyboard trap within the nutrition and ingredients section prevented MACON from independently selecting and customizing menu items and completing his order using his screen reader software. Defendant's failure to make these functions accessible to MACON's screen reader software denied MACON the same access to Defendant's goods that Defendant's Website provides to non-disabled customers.

23. Defendant's Website is additionally used to search for brick-and-mortar locations, check Defendant's hours, pricing, offerings, and sign

up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or the Orlando Location.

24. The opportunity to shop and pre-shop Defendant's offerings available for purchase at the Orlando Location and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at the Orlando Location from his home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MACON's in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. March 30, 2026;

b. April 17, 2026; and

c. September 22, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at the Orlando Location.

28. While notice to Defendant is not required, MACON sent a pre-suit communication on April 17, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at the Orlando Location.

30. However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

**VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT**

31. MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

42 U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose.

. . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

38. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).
[2] 42 U.S.C. § 12188(b).
[3] 42 U.S.C. § 12188(a).
[4] Johnson, *supra* note 8.
[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).
[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40. Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from the Orlando Location and Defendant's other Culver's restaurant locations.

41. The Orlando Location and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42. There is a physical nexus between Defendant's Website and Culver's restaurant locations, including the Orlando Location, in that Defendant's Website provides restaurant location information, access to menu offerings and food and beverage products, pickup ordering, gift cards, and Defendant's rewards program. Defendant's Website acts as the digital extension of the Culver's restaurant system, including the Orlando Location. The opportunity to review food and beverage products, locate Defendant's restaurants, customize menu items, place orders for pickup, purchase gift cards, and enroll in Defendant's rewards program through Defendant's Website from the comfort of his home are important accommodations

---

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

for Plaintiff because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. These features, available through Defendant's Website, would otherwise allow Plaintiff to independently access and transact with Defendant's restaurant business without the need to physically travel to the Orlando Location, yet he is prevented from doing so as a result of the barriers present on Defendant's Website. Defendant has not provided its business information, including its menu, pickup-ordering, gift-card, and rewards services, in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49. Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

a. **Radio button selection changes automatically when receiving focus**

i. **Issue:** When screen reader users navigate through the "1 Piece 130 cal", "2 Piece 260 cal", "4 Piece 520 cal", and "8 Piece 1040 cal" radio buttons using arrow keys, each radio button is automatically selected upon receiving focus. This behavior creates an insurmountable barrier, as users are unable to navigate through the available options without inadvertently changing the selected quantity.




ii. **WCAG 2.1 AA Violations:** 3.2.1 - A - On Focus

iii. **Impact:** For screen reader users, including individuals who are blind, the automatic selection of radio buttons upon focus makes it impossible to review the available quantity options without unintentionally altering their selection. Users cannot explore the choices of "1 Piece 130 cal", "2 Piece 260 cal", "4 Piece 520 cal", and "8 Piece 1040 cal" freely, as each navigation keystroke triggers an unintended selection change. This prevents blind users from making informed, deliberate choices and effectively denies them equal access to the ordering functionality available to sighted users.

**b. Different Link Names Same Destination**

i. **Issue:** Two links, labeled "View all" and an "arrow icon link", present different names despite both directing users to

the same destination page. This inconsistency creates an unreliable navigation experience for users who depend on link names to determine where a link will take them. When link names are neither clear nor consistent, users cannot confidently distinguish between available links or trust that their selection will produce the expected outcome.




ii. **WCAG 2.1 AA Violations:** 2.4.4 -A, 2.4.3 - A - Link Purpose In Context

iii. **Impact:** For screen reader users, particularly those who are blind and rely exclusively on link text to understand navigation options, encountering two differently named links that lead to the same destination creates significant confusion and erodes trust in the interface. Blind users navigating by link list or tab order will hear two distinct labels and reasonably conclude they represent two different

destinations, leading to disorientation and wasted effort. This inconsistency makes it impossible for these users to navigate with confidence, effectively excluding them from the predictable and reliable browsing experience that sighted users receive through visual context.

### c. Focusable Non-Interactive Text

i. **Issue:** Non-interactive text elements are receiving keyboard focus and are being announced by screen readers as though they are actionable components. This creates a deeply confusing experience for users who rely on keyboard navigation and screen readers, as they reasonably expect any focused element to support an interactive action. When plain text receives focus, users are unable to determine what action, if any, is available, disrupting the logical flow of navigation and rendering the interface unpredictable.



ii. **WCAG 2.1 AA Violations:** 2.4.3 - A - Focus Order

iii. **Impact:** For blind users who navigate exclusively through keyboard focus and screen reader announcements, encountering non-interactive text elements within the focus order creates a serious barrier to usability. Each time focus lands on a plain text element, the screen reader announces it in a manner that implies interactivity, causing blind users to pause, attempt interaction, and receive no response. This repeated pattern of false affordance forces blind users to expend considerable effort attempting to engage with elements that serve no interactive purpose, making it impossible to navigate the page efficiently or with confidence. The resulting experience is disorienting, time-consuming, and exclusionary.

**d. Missing new window indication for see stats link**

i. **Issue:** The links labeled "See Stats," "Read now," "Read more," and "Get Recipes" open in a new browser window without providing any prior warning to the user. No indication is given that a new window will be launched

upon activation. This absence of notification leaves users without the context needed to understand the outcome of their action, potentially causing disorientation, particularly for keyboard and screen reader users who receive no programmatic announcement of the environmental change.




ii. **WCAG 2.1 AA Violations:** 2.4.4 -A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For blind users who rely on screen readers to interpret and navigate web content, the unexpected opening of a new browser window without prior warning causes significant disorientation. When a new window opens silently, blind users may lose their place in the original page, be unaware that their browsing context has changed, and struggle to understand why their back button no longer functions as expected. This loss of navigational control is

particularly harmful for individuals who are blind, as they depend entirely on programmatic cues to understand their environment. The absence of a new window warning effectively strips blind users of the ability to make informed navigation decisions and maintain orientation within the browsing experience.

**e. Non-Descriptive see stats Link Text**

i. **Issue:** Several links across the page employ generic, non-descriptive text such as "Read more," "Learn more," "See stats," and "Get recipes." These labels fail to communicate the purpose or destination of the respective links. Because screen reader users frequently navigate by browsing through a list of links in isolation from surrounding page content, they rely entirely on link text to determine where a link leads. Generic link labels make it impossible for these users to identify the link's purpose without additional context that may not be available to them.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii. **Impact:** For blind users who navigate using screen readers, non-descriptive link text such as "Read more," "Learn more," "See stats," and "Get recipes" presents a critical barrier to independent navigation. When browsing links out of context, blind users hear only the link label, which in these cases provides no meaningful information about the link's destination or purpose. This forces blind users to navigate back and forth through surrounding content in an attempt to infer meaning, a process that is time-consuming, cognitively demanding, and often unsuccessful. As a result, blind users are denied the ability to navigate the page efficiently and independently, placing them at a significant

disadvantage compared to sighted users who can visually assess surrounding context.

f. **Missing accessible name and role for slide navigation buttons**

i. **Issue:** The Next and Previous slide buttons lack both an accessible name and a clearly defined role. Because no label is announced, screen reader users are unable to identify the purpose of these controls. This absence of descriptive information renders it impossible for users who depend on assistive technology to navigate between slides, leaving them without the means to understand or operate the functionality.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, the absence of accessible names and roles on the Next and Previous slide buttons creates a complete barrier to interaction. Because no label is announced, these users cannot determine what the controls do or how to use them. They are entirely unable to move between slides, effectively excluding them from accessing the content presented within the carousel. The Next and Previous buttons must carry clear, programmatically associated accessible names that describe their function, such as "Next slide" or "Previous slide," and each must be assigned a proper button role so that assistive technologies can correctly identify and announce them, ensuring all users can understand and operate the controls without confusion or obstruction.

**g. Non-Descriptive Click Here Link Text**

i. **Issue:** Certain links on the page use vague text such as "Click here," which provides no indication of the link's destination or purpose. Because screen reader users frequently navigate through links in isolation, without the

surrounding page context, they hear only the link text itself. This makes it impossible for them to determine where the link leads, preventing them from understanding or navigating the content effectively.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and navigate using a screen reader, encountering links labeled only as "Click here" presents a significant barrier to independent browsing. Without descriptive link text, these users have no means of determining a link's destination or purpose, forcing them to guess or abandon navigation entirely. Each link must convey its purpose through meaningful, specific, and unique text so that all users, including those relying on assistive technology, can understand where the link leads

and make informed navigation decisions without requiring additional context.

### h. Missing New Window Indication for Click Here Link

i. **Issue:** The links labeled "Click here" and "ingredient statements" open in a new browser window without providing any prior warning to the user. No indication is given that a new window will launch upon activation. This leaves users unaware of the change in context, causing them to believe they remain on the same page and potentially become disoriented. Keyboard and screen reader users are particularly affected, as no announcement is made to signal the navigational change.




ii. **WCAG 2.1 AA Violations:** 2.4.4 -A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and depend on screen readers, the absence of any new window warning creates significant disorientation and loss of navigational control. When a new window opens without notice, these users may be unaware that their browsing context has changed, making it difficult to return to their previous location or understand the current state of the page. Links that open in a new window must clearly communicate this behavior prior to activation, either through visible text such as "(opens in a new window)" or through a programmatically associated accessible label, ensuring that screen reader users receive this information and can navigate with full awareness and confidence.

**i. Missing Accessible Name and Role for Sauce Combo Box**

i. **Issue:** The sauce combo box is present on the page but lacks both an accessible name and a properly defined role. Because no label is announced, screen reader users are unable to determine the purpose of this field. Without a correctly assigned role, assistive technologies cannot identify the element as a combo box, making it impossible

for users who rely on screen readers to understand or interact with the control.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 1.3.1 - A - Name Role Value

iii. **Impact:** For users who are blind and rely on assistive technology, the absence of an accessible name and role on the sauce combo box creates a complete barrier to interaction. Without a programmatically associated label or correct role, screen readers cannot convey the field's identity or purpose, leaving these users with no means of understanding what the control represents or how to use it. The sauce combo box must be assigned a clear, visible label that is programmatically linked to the control, and it must carry the correct role so that assistive technologies can announce it accurately. The name, role, and current value

must always be exposed to assistive technologies, ensuring users can engage with the control without encountering any barrier.

**j. Missing Keyboard Support for the Combo Box Options**

i. **Issue:** The sauce combo box list items are not fully accessible to keyboard or screen reader users. Once the combo box is opened, users are unable to navigate through the available options using standard keyboard interactions such as the arrow keys. Screen readers do not clearly announce the list items, making it impossible for users to identify the available choices. This constitutes a critical barrier, as users cannot select a sauce option or determine what selections are available to them.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A - Name Role Value

iii. **Impact:** For users who are blind and depend on keyboard navigation and screen reader technology, the lack of keyboard support within the sauce combo box renders the control entirely unusable. The inability to move through list items using arrow keys, combined with the failure of screen readers to announce available options, means these users cannot independently make a selection or even determine what choices exist. The combo box must support full keyboard operability, including the ability to open the control using the Enter or Space key and traverse options using arrow keys. Each list item must be clearly announced by screen readers, including its name and position within the list. Proper ARIA roles, including combobox, listbox, and option, must be implemented so that assistive technologies can accurately interpret and communicate the component's structure, ensuring all users can navigate and select a sauce without obstruction.

**k. Incorrect Heading Level Defined in the Page**

i. **Issue:** The text "Your Zodiac Scoop," among others, is incorrectly marked as H2 when it should be designated as

H3, resulting in a heading level that does not conform to the proper hierarchical order established on the page. This misuse of heading levels disrupts the logical structure of the content and undermines the navigational framework that assistive technology users rely upon. Screen reader users depend on correctly ordered headings to understand the organization of page content and to move efficiently between sections. When heading levels are skipped or applied incorrectly, the content hierarchy becomes unclear, rendering navigation and content discovery effectively inaccessible for users of assistive technologies.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers, incorrectly assigned heading

levels such as the use of H2 in place of H3 for "Your Zodiac Scoop" and similar text, cause significant disorientation when navigating the page. Screen readers announce heading levels as part of their structural navigation, and when those levels do not follow a correct and logical order such as H1, H2, H3, users cannot accurately interpret the content hierarchy or determine the relationship between sections. This makes it impossible for blind users to efficiently scan, navigate, or comprehend the page using heading-based navigation commands. Headings must follow a correct and logical sequence, with each section assigned an appropriate heading level based on its position within the content. Headings must not skip levels or be applied solely for visual styling purposes. A properly structured heading hierarchy ensures that assistive technologies can accurately present the page layout, enabling users to navigate content with ease and confidence.

**l. Clear Selection Option Not Accessible in Sauce Combo Box**

i. **Issue:** The sauce combo box does not provide a clear and accessible mechanism for removing a previously selected

option. Users who rely on keyboard navigation or screen readers are unable to locate or interact with any option to clear their selection. This forces users to retain an unwanted selection with no available means of correction, creating a significant functional barrier. The absence of a clearly operable clear selection control also prevents users from rectifying input errors made during the selection process.




ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A - Name Role Value

iii. **Impact:** For users who are blind or have visual disabilities and depend on screen readers or keyboard-only navigation, the absence of an accessible clear selection option within the sauce combo box creates a critical barrier to independent and accurate form interaction. Blind users navigating by keyboard have no means of identifying or

activating a control to remove an unwanted selection, leaving them unable to correct their input or proceed with confidence. This lack of accessible functionality effectively removes user autonomy during the selection process. The combo box must include a clearly visible and keyboard-accessible option to clear the selected value, which must be properly announced by screen readers with a descriptive label such as "Clear selection," so that all users can understand its purpose and operate it without difficulty.

**m. Keyboard Trap in Nutrition & Ingredients Section**

i. **Issue:** Users who navigate exclusively by keyboard or screen reader become trapped within the Nutrition & Ingredients section upon entering it. Once focus is directed into this section, it cannot be moved to any preceding or subsequent area of the page using standard keyboard controls. Standard keys such as Tab and Shift + Tab fail to move focus out of the section, effectively blocking the user from continuing their task or accessing any other page content. This constitutes a critical keyboard accessibility barrier that prevents full and independent page navigation.




ii. **WCAG 2.1 AA Violations:** 2.1.2 - A, 2.1.1 - A - No Keyboard Trap

iii. **Impact:** For users who are blind or have visual disabilities and rely solely on keyboard navigation or screen readers, becoming trapped within the Nutrition & Ingredients section represents a severe and disabling barrier. Blind users have no alternative means of navigating away from a section when standard keyboard controls such as Tab and Shift + Tab cease to function as expected, leaving them completely unable to access the remainder of the page or complete their intended tasks. This keyboard trap effectively renders the entire page beyond that section inaccessible, causing frustration, loss of independence, and an inability to engage with the website's content. Users must be able to enter and exit the Nutrition & Ingredients

section freely using only the keyboard, with focus moving in a logical and predictable order at all times. No component on the page should ever prevent a user from navigating away using standard keyboard controls, ensuring that all users retain full and unimpeded access to every part of the page.

51. Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about April 10, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52. More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

53. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant's Website

accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57. Here, however, MACON, through counsel, did send a pre-suit communication informing Defendant of the barriers to access on April 17, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58. As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to the Orlando Locatioin, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and the Orlando Location.

59. Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60. Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61. MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief; including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the

services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating the Orlando Location and Defendant's other Culver's restaurant locations, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's

Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

Dated: October 2, 2026 Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com

**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**